# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CARLA E. GUZMAN,

    *Plaintiff*,

*v.*                  CASE NO. 13-CV-14327

CAROLYN W. COLVIN        DISTRICT JUDGE GERALD E. ROSEN
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Title II of the Social Security Act 42 U.S.C. §§ 401-434. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 14.)

Plaintiff Carla Guzman was 37 years old at the most recent administrative hearing. (Transcript, Doc. 7 at 29, 214.) Plaintiff alleges her disability began when she was 34 years old, i.e., on March 13, 2009. (Tr. at 214.) Plaintiff worked as a telephone sales person for five years, as a staffer for two years, and in wholesale for one year. (Transcript, Doc. 8 at 249.) On December 17, 2009, Plaintiff filed the present claim for DIB, alleging that she became unable to work on March 13, 2009. (Tr. at 214.)

The claim was denied at the initial administrative stage. (Tr. at 118.) In denying the claim, the Commissioner considered other and unspecified arthropathies and affective disorders. (*Id.*) On August 21, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Kevin Detherage, who considered the application for benefits de novo. (Tr. at 10-28, 29-101.) In his decision issued on December 14, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 23.) Plaintiff requested a review of this decision on January 17, 2013. (Tr. at 7-9.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 15, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On October 11, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl.'s Compl., Doc. 1.)

### B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390

(1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly

since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the

4

courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353); *accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two

programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474; *see also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ found at step one that Plaintiff met the insured status requirements through September 30, 2014, and had not engaged in substantial gainful activity since December 17, 2009, the alleged onset date. (Tr. at 15.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: bipolar disorder, depression, and anxiety disorder. (*Id.*) The ALJ also considered the non-severe impairments of hiatal hernia, and sinusitis. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal any of the listings in the regulations. (Tr. at 15-17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 22.) The ALJ also found that Plaintiff was thirty-four years old on the alleged onset date, putting her in the "younger individual age 18-49" category. (Tr. at 22.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of light jobs existing in significant numbers in the regional economy. (Tr. 17-22.) Accordingly, the ALJ found that Plaintiff was not disabled. (Tr. at 23.)

7

E.      **Administrative Record**

The medical records show that Plaintiff was treated for mental health issues (anxiety, stress, panic attacks) at List Psychological Services (Tr. at 324-43,) White Pine Inpatient Services (Tr. at 344-486,) and with Dr. Brian DeBeaubien, M.D. (Tr. at 509-28) in 2010. Plaintiff's self report as to the level of her problems was largely "no problem" with moderate problem with depression, sudden change in mood, lack of energy, not liking others and not liking self, and a serious problem with anxiety only. (Tr. at 329.) Plaintiff did not report any severe problems. (*Id.*)

In March 2010, Plaintiff sought treatment with Matrix Pain Management (Tr. at 487-508) for pain following a laproscopic gall bladder removal surgery. (Tr. at 487.) Plaintiff was already taking Percocet and "want[ed] something that might work faster because she states it scares her 9-year-old when it occurs." (Tr. at 487-88.) On March 23, 2010, Plaintiff complained that she "was not getting good relief from her pain medication" and 'stated that she had Darvocet that she had used previously and asked if she could add these, which I instructed her to do." (Tr. at 494.) Plaintiff was also placed on a Fentanyl pain medication patch for her abdominal pain. (Tr. at 498. 499, 501, 503.)

On April 1, 2010, Plaintiff "initially came in [in-]patient ca[r]e voluntarily, reporting that she is in mania and having pressured speech, elated, expansive[,] [h]er mind is racing, unable to sleep[.]" (Tr. at 347.) Since Plaintiff indicated that she might "do something to hurt herself[,]" she was admitted to the Healthsource hospital in Saginaw, Michigan, through April 8, 2010. (*Id.*) During the weekend, Plaintiff 'started getting very upset" that she was not receiving fentanyl, she "got very angry and she wanted to get her fentanyl." (Tr. at 348.) It was noted that "[s]he is still having pain in spite of the higher dosages of the fentanyl 100 mg she is receiving" and that her

doctors would be "looking into gradually tapering her dosages." (*Id*.) Plaintiff would also "see a counselor and seek some substance abuse counseling . . . . She is still having a hard time accepting that she is taking an excessive amount of the narcotics." (*Id*.)

Plaintiff was diagnosed with "[b]ipolar disorder, manic, with recent episode, along with a history of benzodiazepine dependency and heavy narcotic dependency." (Tr. at 349.) As to physical issues, it was noted that Plaintiff had "[u]nexplainable abdominal pain[.]" (*Id*.) The pain began after Plaintiff underwent gallbladder surgery but because her physician was "unable to understand why she is having so much pain[,]" Plaintiff "ended up going to the Matrix and taking the narcotics[.]" (Tr. at 351.)

By April 4, 2010, Plaintiff was "alert and oriented well; mainly preoccupied about the stress at home. Thought process was logical and relevant. Admitted that she had some problems controlling her temper." (Tr. at 361.) On April 5, 2010, Plaintiff was "very upset" because she "believes that she needs to be on the Geodon" and "off of the Abilify." (Tr. at 363.) After being informed that the medication problems would be discussed with the Matrix Clinic and Dr. Nagarkar, Plaintiff was "half-heartedly willing" to accept this result. (*Id*.) On April 6, 2010, it was again noted that Plaintiff was "very upset that she is not getting her pain medications as she should be" and was "not feeling very happy about some of the pain medications being reduced, very angry and volatile." (Tr. at 365.) Plaintiff was again informed that the Matrix Pain Clinic would be contacted and "if they recommend her to continue on the fentanyl, we will do it, too." (*Id*.) On April 7, 2010, Plaintiff was "somewhat relaxed" after the hospital "placed her back on fentanyl" and was told to follow up on her prescriptions with the Matrix Pain Clinic. (Tr. at 369.) Plaintiff was discharged with the following warning:

I have clearly discussed with her that she seems to be on an excessive amount of pain medications. She needs to come off from these medications. However, she reported she was managed with the Matrix Pain Clinic. I strongly doubt that the patient has any motivation to get off the pain medications. Obviously seems to be having an addictive problem here either with pain medications or with the benzodiazepines. I decided to discharge her to follow up at List Psychological with Michael Murphy, and also appointment with Dr. Nagarkar is given to her.

(Tr. at 369.)

In June of 2010, Plaintiff tripped over a ball, fell on her right knee, and suffered a torn meniscus which was repaired via arthroscopic surgery. (Tr. at 721.)

Plaintiff underwent a physical consultative examination on December 17, 2010. (Tr. at 721-28.) All of Plaintiff's physical systems were normal except for pain in her low back and right knee, and it was noted that she had a hiatal hernia. (Tr. at 722-23.) It was noted that Plaintiff had the ability to do everything, i.e. sitting, standing, dressing, climbing stairs, etc. (Tr. at 724.)

A psychiatric/psychological consultative examination was performed on January 10, 2011. (Tr. at 729-34.) Plaintiff reported that she "likes to play scrabble, watch movies, put puzzles together, and spend time with her son. She also enjoys reading but she feels her attention span is not what it used to be." (Tr. at 730.) Plaintiff also "vacuums, washes dishes and cooks." (*Id*.) Plaintiff's "contact with reality was good[,] [h]er insight is adequate[,] [h]er self-esteem is fair though she stated 'I don't like being fat[,] [h]er motor activity was normal[,] [and h]er motivation is fair but she seems to sleep a lot." (Tr. at 731.) Plaintiff's "thoughts were spontaneous, logical and organized. She seemed bright." (*Id*.) Plaintiff was found to be "able to understand, retain, and follow one and two step instructions[,] . . . to perform and remember simple, routine, and repetitive tangible tasks. She does not have any intellectual deficits and has the capability to perform complex or multi-step tasks, make independent work-related decisions, and engage in abstract

10

thinking and work that is not routine." (Tr. at 732.) "However, her symptoms of Bipolar Disorder and anxiety are significant and will interfere with her ability to perform any job duty, simple or complex, on a consistent and reliable basis." (*Id.*)

In August of 2011, an MRI of Plaintiff's right knee showed "some degenerative changes in the posterior horn medial meniscus" that were "similar to her previous findings." (Tr. at 762.) However, it was noted that "currently her symptoms are not severe enough or frequent enough" to consider another compartmental arthroplasty. (*Id.*)

At the administrative hearing, Plaintiff testified that she attended community college for several years. (Tr. at 33-34.)  Plaintiff lives with her twelve year-old child at her parent's home. (Tr. at 34.) When asked whether she has any source of income, Plaintiff responded, "I have none." (*Id.*) However, when asked about specific sources, Plaintiff indicated that she receives food stamps, that her son receives a free school lunch, and that she receives child support. (Tr. at 34-35.) Plaintiff last worked in 2011 placing phone calls regarding insurance promotions and that work was full-time from 9:00 a.m. to 5:30 p.m. (Tr. at 35-36.) Plaintiff worked there for a two week trial period at the end of which "they just decided not to keep me." (Tr. at 37.) Before that, in 2009, Plaintiff worked as a wholesale apparel distributor in Washington State for one year until she was fired for "absence problems, which were related to daycare" and "problems when there was snow and things like that . . . ." (Tr. at 38.)

Plaintiff checked herself in and was hospitalized for eight days for manic depression approximately two weeks before the administrative hearing. (Tr. at 42-43.) Plaintiff had been unable to sleep for more than two hours at a time for three months and then "crashed, that's when I called and I couldn't function . . . ." (Tr. at 43.) Plaintiff indicated that although she volunteered

to be hospitalized, because "they got me to say that I was suicidal[,] that is why the commitment "bec[a]me involuntary." (Tr. at 44.) Plaintiff stated that she has had manic depressive issues since middle school but that she was not diagnosed until 2005. (Tr. at 47.) Plaintiff has some concentration issues in that she will read lines in a book several times over but she does not have difficulty making decisions. (Tr. at 49.) Plaintiff is able to care for her son's needs and gets along with her family but is "irritable at times, which is a problem." (Tr. at 50.) Plaintiff testified that the only physical problem she has is a "hiatal hernia, but I take medication for it daily and it's pretty well controlled." (Tr. at 51.) Plaintiff has a driver's license but only drives when she is up to it and is able to sit and walk fine, without any physical troubles. (Tr. at 53, 56-57.) Plaintiff takes care of her daily needs, gets dressed daily, and spends most of her time with her son, "mak[ing] sure he's up and fed and brushed his teeth and taken his medicine." (Tr. at 54.) Plaintiff summarized that "[t]hat's the main thing I do is take care of him." (*Id.*) Plaintiff does not do much but rest when her son is in school then after school she makes her son a snack, makes sure he does his homework and reading, and then she helps with dinner but is "clumsy" and "spill[s]." (Tr. at 55-56.) Plaintiff does not leave the house much except to go to the grocery store and to visit her two aunts that live separately in the same town as Plaintiff. (Tr. at 56-57.)

Plaintiff also enjoys "crafting," i.e., making wreaths and has "been spending the . . . majority of the last three months doing. That's what I did with, because I was working on wreaths 18 hours a day." (Tr. at 57.) Plaintiff "created 30 wreaths in three months" and she indicated that "they're good" and explained that "I'm not saying that to be boastful. They're pretty and they're different and they're interesting, you know?" (Tr. at 57-58.) Each wreath takes Plaintiff "two days or it can take a month. It depends on the difficulty and the time involved and the materials." (Tr.

at 58.) When asked what materials she uses, Plaintiff stated that she "love[s] going to thrift stores" and finding inexpensive cloth, lace and ribbon to use. (*Id.*) Plaintiff is "going to try to go and do a bazaar to sell them I guess because they're good enough and people really like them." (*Id.*) When asked whether her techniques involve cutting or twisting, Plaintiff told of a wreath that took "[p]robably a month" to do where she "made it out of cardboard and you would never know it was cardboard. I painted them and then I cut them into spirals and then I glued them into rosettes onto a styrofoam. And, everybody loves it and it's cardboard." (Tr. at 59.) Plaintiff often works on four or five wreaths at a time for variety. (Tr. at 59-60.) When Plaintiff works on her wreaths, she spends "up to 18 hours a day" and she "tr[ies] to be quiet when it was from midnight to 6:00." (Tr. at 60.)

When questioned by her attorney, Plaintiff stated that she is in a "constant state of anxiety. So, the panic attacks aren't so much happening as just I'm always, I always can't breath[e]." (Tr. at 64.) Plaintiff also indicated that she has a compulsion for making the wreaths and that before doing the wreaths, she would watch television "like marathon TV." (Tr. at 65.)

Plaintiff's mother testified that Plaintiff can be confrontational, that she will organize her room and then tear it up again, that Plaintiff yells and screams at her at times, that Plaintiff doesn't have any friends, that Plaintiff does beautiful work on the wreaths "when she's feeling well" but that she only has five good days per month. (Tr. at 82-89.)

The ALJ posed the following hypothetical to the vocational expert (VE):

> a hypothetical individual of the claimant's age and education, with the past jobs that you just described. Further assume that the individual has a residual functional capacity to do medium work, which is unskilled and that the hypothetical individual should avoid exposure to concentrated amounts of dusts, fumes, gases, or poor ventilation and assume further that the individual would be absent from work one day a month.

(Tr. at 77.) The VE responded that such an individual could not perform any of the past relevant work because the past work "exceeded the unskilled level." (Tr. at 77-78.) The VE indicated that absence from work two or more days a month would preclude work but that once a month would be "quite okay." (Tr. at 78.) After listing available jobs that such an individual could perform, the ALJ then posed a second hypothetical:

> the individual is limited to light work, which is unskilled with no production rate base work, which is limited to only occasional changes in routine work setting. Again, the individual should avoid concentrated amounts of dusts, fumes, gases, or poor ventilation. And, again assume that the individual would be absent from work one day a month.

(Tr. at 79.) The VE responded that such an individual could not perform Plaintiff's past work because it was skilled, but indicated that such an individual could perform the 15,000 cleaner jobs available in the lower peninsula of Michigan, the 1500 parking booth cashier jobs, and the 54400 production inspector jobs would be available. (Tr. at 79-80.)

**F.     Analysis**

**1.     Legal Standards**

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I next consider whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff contends that the ALJ's credibility findings, especially with respect to non-exertional conditions, are not supported by substantial evidence, and that, contrary to the ALJ's findings, Plaintiff met or equaled Listed Impairment 12.04. (Doc. 11.) I suggest that substantial evidence supports the ALJ's decision and I recommend denying Plaintiff's claim.

### a.   Plaintiff's Credibility and RFC findings

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc.*

*Sec.*, No. 09-5773, 2011 WL 180789 at \*4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at \*2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at \*2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at \*2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at \*1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *see also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

In the instant case, the ALJ thoroughly considered the relevant factors in light of the record evidence. (Tr. at 17-21.) I suggest that his credibility findings are supported by substantial evidence. Although Plaintiff undoubtedly suffers from mental health issues, Plaintiff self-reported the level of her problems as "no problem" with moderate problem with depression, sudden change

17

in mood, lack of energy, not liking others and not liking self, and a serious problem with anxiety only. (Tr. at 329.) Plaintiff did not report any severe problems. (*Id.*) Even when Plaintiff was hospitalized in April of 2010, most of her aggravations were related to her desire to control the type and amount of narcotic pain medication she would receive. (Tr. at 348, 363, 365.) Plaintiff was diagnosed with "[b]ipolar disorder, manic, with recent episode, along with a history of benzodiazepine dependency and heavy narcotic dependency." (Tr. at 349.) By April 4, 2010, Plaintiff was "alert and oriented well; mainly preoccupied about the stress at home. Thought process was logical and relevant. Admitted that she had some problems controlling her temper." (Tr. at 361.) At discharge, the concern was focused on her "excessive amount of pain medications" and how she "seems to be having an addictive problem here either with pain medications or with the benzodiazepines." (Tr. at 369.)

Although Plaintiff complains that Dr. Menendes's opinion was not incorporated into the ALJ's RFC findings, this consultative examiner's opinion[2] is generally in accord with the ALJ's findings. The consultative examiner found Plaintiff's "contact with reality was good[,] [h]er insight is adequate[,] [h]er self-esteem is fair though she stated 'I don't like being fat[,] [h]er motor activity was normal[,] [and h]er motivation is fair but she seems to sleep a lot." (Tr. at 731.) Plaintiff's "thoughts were spontaneous, logical and organized. She seemed bright." (*Id.*) Plaintiff was found to be "able to understand, retain, and follow one and two step instructions[,] . . . to perform and remember simple, routine, and repetitive tangible tasks. She does not have any intellectual deficits and has the capability to perform complex or multi-step tasks, make

---

[2]The Commissioner correctly notes that Dr. Menendes is not a treating physician but rather a consultative examiner. (Doc. 14 at 11, n. 3.)

independent work-related decisions, and engage in abstract thinking and work that is not routine."
(Tr. at 732.) In addition, "[h]er social skills are adequate and she should be able to interact
appropriately with others." (*Id*.)

Although the consultative examiner found that Plaintiff's " symptoms of Bipolar Disorder
and anxiety are significant and will interfere with her ability to perform any job duty, simple or
complex, on a consistent and reliable basis," (Tr. at 732), I suggest that the ALJ committed no
error in relying on Plaintiff's own statements that she was able to craft and make wreaths for "18
hours a day" and that she  "created 30 wreaths in three months[.]" (Tr. at 57-58.)

Plaintiff's daily activities also show her abilities exceed those with disabling mental
conditions. Plaintiff stated that she "likes to play scrabble, watch movies, put puzzles together, and
spend time with her son. She also enjoys reading but she feels her attention span is not what it used
to be." (Tr. at 730.) Plaintiff also "vacuums, washes dishes and cooks." (*Id*.) Plaintiff is able to
care for her son's needs and gets along with her family but is "irritable at times, which is a
problem." (Tr. at 50.) Plaintiff has a driver's license but only drives when she is up to it and is able
to sit and walk fine, without any physical troubles. (Tr. at 53, 56-57.) Plaintiff takes care of her
daily needs, gets dressed daily, and spends most of her time with her son, "mak[ing] sure he's up
and fed and brushed his teeth and taken his medicine." (Tr. at 54.) Plaintiff summarized that
"[t]hat's the main thing I do is take care of him." (*Id.*) Plaintiff also cooks for her son and makes
sure he does his homework and reading. (Tr. at 55-56.)

In addition, Plaintiff seemed less than reliable when she answered that she had no sources
of income (Tr. at 34) but then when asked about specific sources, Plaintiff indicated that she
receives food stamps and that she receives child support. (Tr. at 34-35.) Finally, Plaintiff did not

testify that her symptoms caused her to stop working but rather that she was fired for "absence problems, which were related to daycare" and "problems when there was snow and things like that . . . ." (Tr. at 38.)

I therefore suggest that substantial evidence supports the ALJ's credibility decision and the attendant RFC findings.

### b.    Listing 12.04

The ALJ considered all of Plaintiff's mental impairments, singly and in combination, and made specific findings as to each of the criteria applicable under the Listing. (Tr. at 15-17.)

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id.; see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

20

The ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

The ALJ's step-three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. A'ppx 408, 411 (6th Cir. 2006). The ALJ does not need to use a particular format, and reviewing courts will read the decision "as a whole . . . to ensure there is sufficient development of the record and explanation . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis"). The claimant carries the burden of proof at step three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339

21

(3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment").

In *Retka v. Commissioner of Social Security*, decided before SSR 96-6p was issued, the Sixth Circuit's analysis somewhat opaquely adumbrated *Ballardo*. 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) (unpublished table decision). The Sixth Circuit noted the need for expert opinions on equivalence, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." *Id.* The ALJ had scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the attack on the decision. *Id.* "The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ." *Id.* As the Circuit stated elsewhere, "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

As to Listing 12.04, the following specifics must be met:

the so-called A criteria are satisfied by medical documentation of bipolar syndrome with a history of episodic periods. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 . . . . The B criteria [] are satisfied by a showing of at least two of the following functional limitations: 1) a marked restriction of activities of daily living, 2) marked difficulties in maintaining social functioning, 3) marked difficulties in maintaining concentration, persistence, or pace, or 4) repeated episodes of decompensation, each of extended duration. *Id.* If the ALJ determines that the claimant has a severe

mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC and move on to steps four and five.

*Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 653 (6th Cir. 2009). In *Rabbers*, the Sixth Circuit held that the plaintiff's bipolar disorder did not seriously interfere with his ability to function on a daily basis where his daily activities were self-described as watching television, visiting a soup kitchen, doing some household chores and attending NA or AA meetings. *Id.* at 658. In the instant case, I suggest that Plaintiff's self-described daily activities show even more functioning than those in *Rabbers*. Plaintiff stated that she "likes to play scrabble, watch movies, put puzzles together, and spend time with her son. She also enjoys reading but she feels her attention span is not what it used to be." (Tr. at 730.) Plaintiff also "vacuums, washes dishes and cooks." (*Id*.) Plaintiff is able to care for her son's needs and gets along with her family but is "irritable at times, which is a problem." (Tr. at 50.) Plaintiff has a driver's license but only drives when she is up to it and is able to sit and walk fine, without any physical troubles. (Tr. at 53, 56-57.) Plaintiff takes care of her daily needs, gets dressed daily, and spends most of her time with her son, "mak[ing] sure he's up and fed and brushed his teeth and taken his medicine." (Tr. at 54.) Plaintiff summarized "[t]hat's the main thing I do is take care of him." (*Id.*) Plaintiff also cooks for her son and makes sure he does his homework and reading. (Tr. at 55-56.) I therefore suggest that the ALJ properly determined that Plaintiff has not shown that her depression markedly restricts her daily activities but only mildly restricted her. (Tr. at 16.)

As to social functioning, the Court in *Rabbers* held that where Plaintiff had anger management problems, was not a "people person," but got along with most of his family, the evidence did not show that his disorder interfered with his ability to maintain social functioning. *Rabbers*, 582 F.3d at 659. I suggest that the same is true in the instant case. Plaintiff's psychiatric

23

evaluators noted that Plaintiff's "contact with reality was good[,] [h]er insight is adequate[,] [h]er self-esteem is fair though she stated 'I don't like being fat[,] [h]er motor activity was normal[,] [and h]er motivation is fair but she seems to sleep a lot." (Tr. at 731.) Plaintiff's "thoughts were spontaneous, logical and organized. She seemed bright." (*Id*.) Plaintiff and her mother testified as to Plaintiff's irritability; however, the consultative examiner found that "[h]er social skills are adequate and she should be able to interact appropriately with others." (*Id*.) I suggest that this record evidence demonstrates that the ALJ properly found that Plaintiff's mental health issues moderately interfered with her ability to maintain social functioning. (Tr. at 16.)

As to concentration, persistence or pace, although Plaintiff indicated that her attention span is not what it used to be (Tr. at 730,) and that she will read lines in a book several times over but she does not have difficulty making decisions. (Tr. at 49,) the consultative examiner found that Plaintiff was "able to understand, retain, and follow one and two step instructions[,] . . . to perform and remember simple, routine, and repetitive tangible tasks. She does not have any intellectual deficits and has the capability to perform complex or multi-step tasks, make independent work-related decisions, and engage in abstract thinking and work that is not routine." (Tr. at 732.)  I therefore suggest that substantial evidence supports the ALJ's finding that Plaintiff had only moderate difficulties in this area. (Tr. at 17.)

As to the fourth and final functional area, Plaintiff suffered no episodes of decompensation. Since I suggest that Plaintiff cannot show even one, let alone two, functional limitations to satisfy the "B" criteria, I suggest that the ALJ properly found that Plaintiff did not meet Listing 12.04.

### 3.    Conclusion

24

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140,(1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response

proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 27, 2015                      /S PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge